UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JASON D. INMAN**,                                                   Case No. 1:13-cv-00202-KI

                     Plaintiff,                          OPINION AND ORDER

     v.

**COMMISSIONER OF SOCIAL
SECURITY**,

                   Defendant.

     Tim Wilborn
     Wilborn Law Office, P.C.
     P.O. Box 370578
     Las Vegas, NV  89137

            Attorney for Plaintiff

     S. Amanda Marshall
     United States Attorney
     District of Oregon
     Adrian L. Brown
     Assistant United States Attorney

Page 1 - OPINION AND ORDER

1000 S.W. Third Ave., Suite 600
Portland, OR 97201-2902

Lars J. Nelson
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Jason D. Inman brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB").

I affirm the decision of the Commissioner.

## BACKGROUND

Inman filed an application for DIB on May 21, 2009, alleging disability beginning

January 4, 2009. The application was denied initially and upon reconsideration. After a timely

request for a hearing, Inman, represented by counsel, appeared and testified before an

Administrative Law Judge ("ALJ") on October 5, 2011.

On October 31, 2011, the ALJ issued a decision finding Inman was not disabled within

the meaning of the Act and therefore not entitled to benefits. This decision became the final

decision of the Commissioner when the Appeals Council declined to review the decision of the

ALJ on November 30, 2012.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]"  20 C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled.  If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past.  If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work.  20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards.  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less

than a preponderance.  Id. (internal quotation omitted).  The court must uphold the ALJ's

findings if they "are supported by inferences reasonably drawn from the record[,]" even if the

evidence is susceptible to multiple rational interpretations.  Id.

## THE ALJ'S DECISION

The ALJ found Inman had the following severe impairments:  status post right ankle

fracture with open reduction, internal fixation surgery in January 2009; status post perforated

colon with colostomy in July 2005; hypertension; morbid obesity; and adjustment disorder with

symptoms of anxiety.  The ALJ found that these impairments, either singly or in combination,

did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R.

§ 404, Subpart P, Appendix 1.  The ALJ crafted a residual functional capacity ("RFC") for Inman

limiting him to sedentary or light work, with the exception of lifting and carrying 20 pounds

occasionally and 10 pounds frequently.  He can also stand and walk for a total of two hours in an

eight-hour workday, but can be on his feet either walking or standing for no more than 15

minutes at a time.  He is able to sit for six hours in an eight-hour workday.  He should no more

than occasionally climb, balance, stoop, kneel, crouch and crawl.  He may need to use a cane.  He

can understand and remember simple, routine tasks but should not have to understand and

remember detail-oriented tasks.  He is capable of sustaining concentration and persistence with

simple, routine tasks but should not be placed in a situation requiring sustained concentration and

persistence for detail-oriented tasks.

Given this RFC, the ALJ concluded Inman cannot perform his past relevant work, but can perform work as a charge account clerk, a telephone quotation clerk, and a semiconductor bonder.

**FACTS**

Inman, who was 34 years old on his alleged onset date of disability, has a high school degree.  He has worked at many different jobs, including gas station attendant, truck mechanic, medical aide or nurse assistant, mill hand, painter in a manufacturing industry, and as a sales attendant/stocker.

Inman had a colostomy in July 2005, after he was hospitalized for abdominal pain.  He was sent home with a colostomy bag.  He saw his surgeon, Raul Mirande, M.D., at two follow-up appointments.  In August, Dr. Mirande counseled him to lose weight and informed him that he would need to weigh less than 250 pounds to reverse the colostomy.  In October, Dr. Mirande urged Inman to increase his activity level and begin a dieting program.

Inman first established care with his primary treating physician, Joyce Hollander-Rodriguez, M.D., in 2003.  Throughout 2007 and 2008, Dr. Hollander-Rodriguez treated Inman's sleep apnea, high blood pressure, and hypothyroidism.  She attempted to address his morbid obesity by urging him to diet and increase his activity.

In February 2007, Inman returned to Dr. Mirande who noted Inman had failed to maintain a diet and exercise program and now weighed 375 pounds.  The doctor commented, "It appears he has become comfortable with the stomach and therefore is not motivated to lose weight in order to have surgery. . . . If he can get his weight under 300 pounds, we can proceed with colostomy takedown."  Tr. 265.

Page 6 - OPINION AND ORDER

On June 30, 2008, Dr. Hollander-Rodriguez prescribed Alli, a drug designed to treat obesity. Inman was feeling well in July and was tolerating the medication. In September 2008, he reported experiencing pain in his ankles after a long day at work, but no swelling. He had repeatedly twisted and sprained the right ankle in the past. Dr. Hollander-Rodriguez recommended Tylenol or ibuprofen and ankle strengthening exercises; she observed a full range of motion and a normal gait.

Inman testified that he worked until he broke his ankle in January 2009 when he fell down some stairs. At that time, he had been working at a nursing home, where he was a medical aide. Karl C. Wenner, M.D., surgically repaired the fracture that month; Inman wore a non-weight bearing cast until the end of February 2009. He then wore a walking boot for several weeks.

In March 2009, Dr. Hollander-Rodriguez performed a follow-up examination of Inman's ankle. He was able to walk wearing the boot. He had stopped taking Alli because the greasiness in his stool made it too difficult to keep his colostomy bag stuck to his skin. He was trying to change his food intake, but was having "increasing difficulties with work and activity." Tr. 401.

Dr. Gregory Cole performed a psychodiagnostic evaluation of Inman on December 12, 2009. Inman reported that his last job was in 2008, working as a medications aide at the nursing home. He got along with coworkers and supervisors, but quit after he broke his ankle. He reported he lived with his wife and two children, and took care of himself and the household. He washed the dishes and swept and mopped on a daily basis, and shopped and prepared meals twice a week. For fun, Inman told Dr. Cole that he enjoyed working on his car, watching television, and seeing one friend on a daily basis. As for Inman's test results, Dr. Cole commented that

"there was some evidence of poor effort; however, overall, there was no significant inconsistency in the client's responses on the various tasks requested of him." Tr. 410.  In short, Dr. Cole identified an adjustment disorder with symptoms of depression and anxiety.  He thought Inman would be able to sustain simple routine tasks, and that he has only mild problems completing a simple multiple-step task.  Dr. Cole thought the main impediments to Inman working are his "claimed pain problems, shortness of breath, and tendency to give up easily on tasks[.]"  Tr. 412.

At the request of the agency, Dr. Jon McKellar examined Inman's ankle on December 12, 2009; Inman reported he experienced "chronic, aching, constant pain in his right ankle at the area of the fracture."  Tr. 416.  Inman estimated he could walk about half a block before needing to rest, could stand for 15 minutes, and could sit for any length of time.  He thought he could lift 15 pounds.  At the examination, he weighed 360 pounds.  His lower extremity strength was 5+/5+.  Dr. McKellar examined the right ankle and found "no erythema or edema but definitely a major decrease in range of motion" with tenderness "over the periosteous musculature of the fibula.  This is consistent with a fibular fracture with soft tissue injury."  Tr. 416.  Dr. McKellar opined Inman should be able to stand for 15 minutes before he has to sit down, change position, and put his leg up.  He can walk for 10 to 15 minutes before he has to sit down.  He can sit for any length of time but would need to keep his right leg elevated.  Additionally, Dr. McKellar remarked, "[t]here is no way he could travel."  Tr. 417.

Inman did not return to see Dr. Hollander-Rodriguez again until April 27, 2010.  Inman reported ankle pain since the January 2009 surgery, with swelling, discoloration and popping.  He reported continued problems with weight loss and inquired about gastric bypass surgery.  Upon examination, the ankle had "some slight swelling to it and very decreased range of motion to

flexion and extension." Tr. 463.  Dr. Hollander-Knight ordered an x-ray and referred Inman to

Dr. Wenner for reevaluation.  The x-ray of Inman's ankle in April 2010 showed mild

degenerative joint disease.  Tr. 465.

A followup appointment with Margaret Wilson, M.D., and Edward Van Tassel, D.O., of

Dr. Hollander-Rodriguez's office, a month later revealed the right ankle was slightly larger than

left.  Dr. Van Tassel found good strength and stability in the ankle, without crepitace (crackling

or grating sound).  They recommended stretching his heel cord and the possibility of removing a

screw.

Inman did not return to Dr. Hollander-Rodriguez until April 2011.  He reported having

"very good energy," he "can sit and watch a movie," and he gets somewhat "short of breath and

some dyspnea on exertion when he is exercising."  Tr. 456.  He described problems with his right

ankle, including increased swelling and pain which is worse with activity.  Vicodin helped.  He

tried physical therapy, which was painful, but he "is still trying to be active anyway."  Id.  Upon

examination, Dr. Hollander-Rodriguez noticed a tight heel cord with limited range of motion.

She referred Inman to Dr. Wenner to evaluate whether removal of hardware would help.

Dr. Hollander-Rodriguez completed a Medical Source Statement on September 23, 2011,

opining Inman could not perform sedentary or light work, not even with the option of alternating

between sitting and standing, and that these limitations began in 2005.  She opined that Inman

would have moderate difficulties maintaining attention and concentration for an extended period,

moderately severe limitations completing a normal workday, and that these limitations began in

2005.  She offered the following explanation:

Page 9 - OPINION AND ORDER

Mr. Jason Inman has been my patient since 2003. He has hypertension, obesity, obstructive sleep apnea and had a severe abdominal infection that resulted in an ICU admission and colostomy in 2005. He then had a trimalleolar ankle fracture in 2009. Both of these events have left him with severe limitations to his ability to work and function.

Tr. 470.

## DISCUSSION

I.   <u>Inman's Credibility</u>

Inman testified that he did not return to work once he broke his ankle because he did not feel steady on his feet. His ankle hurts all day, from the time he wakes up at five or six until he goes to bed. He does not take any pain pills because he has struggled with narcotics addiction in the past. He testified he gets his children ready for school in the morning, drives into town for coffee, and then spends the day at his mother's house. He picks his children up from the bus stop, helps them with their homework, makes dinner, and then helps them get ready for bed. He can stand for five or ten minutes at a time, and can sit for 30 to 45 minutes if he can get his leg comfortable. At the time of the hearing, he weighed 425 pounds. The ALJ also considered several written reports completed by Inman related to his ability to sit and stand, inability to be active more than five minutes without needing to rest, and that he is fatigued.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of

Page 10 - OPINION AND ORDER

the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the

claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically

identify the testimony she or he finds not to be credible and must explain what evidence

undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General

findings are insufficient to support an adverse credibility determination and the ALJ must rely on

substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative

evidence thereof, he or she may only find an applicant not credible by making specific findings

as to credibility and stating clear and convincing reasons for each."  Robbins v. Soc. Sec.

Admin., 466 F.3d 880, 883 (9th Cir. 2006).

The ALJ found Inman's statements not entirely credible to the extent they were

inconsistent with the RFC.  The ALJ pointed out Inman is morbidly obese, but has worked

despite his weight and is not motivated to lose weight even though it would mean a reversal of

the colostomy.  Inman has also worked with the colostomy bag in the past.  While "the failure to

follow treatment for obesity tells us little or nothing about a claimant's credibility," his ability to

work with both severe impairments (obesity and colostomy) does.  Compare Orn v. Astrue, 495

F.3d 625, 638 (9th Cir. 2007) (citing SSR 02-1p, at 9) with Bayliss v. Barnhart, 427 F.3d 1211,

1216 (9th Cir. 2005) (long-term limitations did not prevent claimant from completing high

school, obtaining a college degree, finishing a training program, and participating in military

training).

Additionally, the ALJ questioned whether Inman has chronic pain in his ankle.  He had

not sought extensive treatment for the ankle in the previous two years, he does not take any pain

pills for his ankle pain, and there is no substantiation of chronic swelling such that he would need

to elevate his ankle.  Further, in a recent visit to his doctor, Inman said he had "very good

energy," was exercising, and was in a good mood.  Tr. 456.  While the ALJ could not rely on

Inman's failure to take medications for his ankle–since Inman gave the reason of past narcotic

addiction as an explanation–the fact that Inman had sought very little treatment for his ankle the

previous two years suggests the pain is not as disabling as he says it is.  Compare Smolen v.

Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (no insurance the reason for not taking medication)

with Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (not seeking aggressive

treatment shows pain not as disabling as reported).  Indeed, the fact that a claimant's symptoms

are not severe enough to motivate him to seek other forms of treatment, even if some treatment is

underway, "is powerful evidence regarding the extent" of the symptom.  Burch v. Barnhart, 400

F.3d 676, 681 (9th Cir. 2005).

        The ALJ also pointed out inconsistencies in the record, aside from those noted in Inman's

most recent doctor's visit, including that in an initial disability application, Inman reported not

having problems with others at work and never having been fired for that reason.  Tr. 213, 197.

After the application was denied, Inman and his wife reported Inman had been fired from most

jobs because of his inability to get along with others.  Tr. 235, 244.  This is not, contrary to

Inman's contention, merely evidence of worsening symptoms between the applications.  Instead,

it is a direct contradiction between the two applications suggesting secondary gain.  Finally, the

ALJ relied on Dr. Cole's comment that Inman tended to give up easily on tasks and showed poor

effort in the testing as evidence of the possibility of exaggeration.  The ALJ could rely on

Inman's poor effort during the examination to discount his credibility, even though Dr. Cole

concluded Inman's responses "overall" were not inconsistent. Tr. 410; Tonapetyan v. Halter,

242 F.3d 1144, 1148 (9th Cir. 2001).

While some of the reasons the ALJ gave for questioning Inman's credibility are not

legally permissible, that does not mean the ALJ's entire credibility assessment is improper.

Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004). The ALJ gave

sufficient clear and convincing reasons, supported by substantial evidence in the record, to find

Inman's testimony about his limitations not entirely credible. The ALJ did not err.

II.    Medical Evidence

Inman challenges the ALJ's treatment of Dr. Hollander-Rodriguez's Medical Source

statement, as well as his partial rejection of Dr. McKellar's opinion regarding Inman's functional

limitations.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician. More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual. Orn, 495 F.3d at 632. If a treating or examining physician's

opinion is not contradicted by another physician, the ALJ may only reject it for clear and

convincing reasons. Id. (treating physician); Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir.

2006) (examining physician). Even if it is contradicted by another physician, the ALJ may not

reject the opinion without providing specific and legitimate reasons supported by substantial

evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at 1066. The opinion of a

nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the

opinion of a treating or examining physician. Widmark, 454 F.3d at 1066 n.2.

Since the state agency doctors contradicted the opinions of both doctors, the ALJ was required to give specific and legitimate reasons to give the opinions of Dr. Hollander-Rodriguez and Dr. McKellar less weight.   Widmark 454 F.3d at 1066-67.

A.    Dr. Hollander-Rodriguez

The ALJ gave little weight to Dr. Hollander-Rodriguez's opinion that Inman has been unable to perform even sedentary work since 2005.  He noted she failed to mention any diagnostic or clinical findings to support her opinion, her progress notes do not support her opinion, and her opinion overly relies on Inman's reports to her and is inconsistent with Inman's work history.

The ALJ gave specific and legitimate reasons, supported by substantial evidence in the record, to reject Dr. Hollander's opinion.  As an initial matter, Inman had performed work as late as 2008, and his colostomy, hypertension, obesity, and sleep apnea did not keep him from working.  Further, as the ALJ pointed out, Inman's treatment for his ankle was not extensive.  He saw Dr. Hollander-Rodriguez once in 2009, once in 2010 and once in 2011.  When he saw her in 2011, he reported having good energy and that he was trying to be active despite the ankle pain. The x-ray reflected only mild degenerative joint disease.  In short, the ALJ is not required to accept the opinion of a physician, even a treating physician, if the opinion is "brief, conclusory, and inadequately supported by clinical findings."  Batson, 359 F.3d at 1195.  The ALJ did not err.

B.    Dr. McKellar

The ALJ gave "some weight" to Dr. McKellar's opinion, but found "the logitudinal record contradicts portions of the doctor's opinion."  Tr. 32.  Specifically, no other physician

suggested Inman should elevate his right leg. The state agency medical consultant opined that the restriction was not fully supported.  Tr. 445.  The ALJ also pointed out Inman's ability to drive and take a bus directly contradicted Dr. McKellar's opinion that Inman was unable to travel. Finally, Dr. McKellar did not have an opportunity to review the entire claim file, unlike the state agency consultants and the ALJ.

I agree with Inman that Dr. McKellar's opinion that Inman should not travel is not necessarily inconsistent with Inman's ability to drive and take a bus, as "travel" in this context probably means moving long distances.  See www.merriam-webster.com/dictionary/travel ("to go on a trip or journey : to go to a place and especially one that is far away").  Similarly, without further explanation as to what was in the "entire claim file" that might change Dr. McKellar's opinion, his lack of access to that file is not a specific and legitimate reason to disregard his opinion.  Tr. 32.  Nevertheless, the ALJ did not err in pointing out the lack of evidence for Inman's need to elevate his leg.  As the ALJ points out, no other physician recommended or prescribed elevation of the leg.  In fact, Dr. McKellar himself commented that there was "no erythema [inflammation] or edema [swelling]," undermining his conclusion that Inman would need to elevate his leg.  Batson, 359 F.3d at 1195.  Since the ALJ's reason for rejecting Dr. McKellar's limitation rests on an inference that can reasonably be drawn from the record–i.e. any other treating or examining physician would have recommended elevating his leg if it was necessary–substantial evidence supports the ALJ's conclusion.  Cf. Widmark, 454 F.3d at 1068 (explaining why not a reasonable inference that an orthopedist would comment on thumb limitations when asked to examine neck and back pain).  The ALJ did not err.

III.    Lay Witness Evidence

Inman's wife and cousin submitted written statements in support of Inman's disability

application.  His wife, Sharon Inman, wrote that Inman needs reminders to bathe, shave, eat, and

get a hair cut, and needs help changing his colostomy bag.  He prepares barbeque but needs help

preparing the rest of the meal.  He does the dishes and picks up around the house, but he stops

and sits down when needed.  His hobbies are watching television, visiting family and friends, and

driving.  He can no longer fish, hike, camp, shoot, work on old cars, or travel because he is not

balanced and "cannot use a lot of energy."  Tr. 234.  He can lift 20 pounds, cannot squat or kneel,

and can only stand and walk for a short time.  She added, "When Jason drives I still watch the

road for other drivers because he does not pay as much attention to drivers that are further back.

I have to talk to him when he is angery [sic] with other people.  I remind him to do a lot of things

when it comes to about everything (kids, housework, yard work, personal care)."  Tr. 237.

Diana Grimm reported that Inman spends his day tending to his children, visiting his

parents, watching television, and going outside when possible.  Inman has no problem with

personal care, needs no reminders, cooks for his children, and picks up his living room.  He

needs help doing the floors.  Inman goes outside a few times a day, drives a car, shops for food

about once a week for about an hour.  He can no longer go fishing or perform any outdoor sports

with his children.  Due to pain in his knees and ankles, and because of his weight, Inman's ability

to lift, bend, stand, walk, kneel, climb stairs and complete tasks is affected.  He can walk for

about one block before needing to stop and rest.  He uses a cane every day.

The ALJ gave little weight to these statements for several reasons:  (1) neither witness

appeared in person so the ALJ had no opportunity to cross-examine them under oath; (2) the

cousin did not indicate how much time she spends with Inman; (3) both repeat Inman's subjective complaints and he is not credible; (4) neither statement reflects Inman's maximal RFC; (5) the wife has a financial interest, her statement portrays Inman as more limited than did both the cousin or Inman himself, and her statement is inconsistent with the medical evidence, with Inman's activities, and with his work history.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006). Indeed, the ALJ's first reason for rejecting these statements was error as the ALJ must consider "evidence from other sources" whether as sworn hearing testimony or unsworn statements and letters of friends and relatives. 20 C.F.R. §§ 404.1513(d), 416.913(d); Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996) (sworn testimony); Schneider v. Comm'r of Soc. Sec. Admin., 223 F.3d 968, 974 (9th Cir. 2000) (unsworn statements).

Nevertheless, the ALJ gave germane reasons to reject both statements. Grimm neglected to complete the section of the statement asking her how much time she spends with Inman and what they do together. As a result, the ALJ questioned how much time the two spent together. She also repeated many of Inman's limitations, and the ALJ found Inman not credible. These are valid reasons to question the validity of the statement.

Additionally, while many of the ALJ's reasons are not germane, such as Sharon Inman's purported financial interest in the outcome of the proceeding, the ALJ's reason that Sharon Inman reported Inman to be much more limited than either Inman or his cousin did is a germane reason. For example, Sharon Inman explained Inman is limited with almost every activity of

daily care, even to the extent that he needs to be reminded to eat, whereas neither Grimm nor

Inman himself reported he needed such help.  This is a germane reason to question the validity of

the lay witness statement.

In sum, the ALJ did not err.

IV.    Dictionary of Occupational Titles

Finally, Inman complains that the ALJ's step five finding is not supported by substantial

evidence because he found Inman capable of performing jobs that require a higher reasoning

level than the RFC limitation to "simple, routine tasks."  Specifically, the ALJ concluded Inman

should not have to understand and remember detail-oriented tasks, but the jobs the VE identified

all require a reasoning level of either 2 or 3 according to the Dictionary of Occupational Titles

("DOT").  See DOT #205.367-014 (charge account clerk requiring reasoning level 3); DOT #

237.367-046 (telephone quotation clerk requiring reasoning level 3); DOT #726.685-066

(semiconductor bonder requiring reasoning level 2).  These reasoning levels, on a one to six

scale, correspond to reasoning levels required for a particular job in the DOT.  Reasoning level 2

requires the ability "to carry out *detailed but uninvolved* written or oral instructions" while

reasoning level 3 requires the ability "to carry out instructions furnished in written, oral, or

diagrammatic form.  Deal with problems involving several concrete variables in or from

standardized situations."  U.S. Dep't. of Labor, DOT, App C (4th ed. 1991), available at 1991 WL

688702 (emphasis added).

While there is no reported Ninth Circuit case, several cases in this district and an

unpublished Ninth Circuit case have found jobs requiring reasoning level 2 to be consistent with

a limitation to simple, routine tasks.  Abrew v. Astrue, 303 F. App'x 567, 569 (9th Cir. 2008) (no

conflict between ability to complete simple tasks and jobs with reasoning level 2 as such jobs require ability to carry out detailed *but uninvolved* instructions); Maxwell v. Comm'r Soc. Sec. Admin., No. 3:12-cv-00475-HU, 2013 WL 4087558, at *19 (D. Or. Aug. 12, 2013) (Findings and Recommendation adopted by Judge Marsh) (claimant limited to simple, routine tasks can perform jobs requiring level 2 reasoning); Patton v. Astrue, No. 6:11-cv-06423-ST, 2013 WL 705909, at *1 (D. Or. Feb. 25, 2013) (order by Judge Hernandez adopting Findings and Recommendation in part); Pitts v. Astrue, No. 03:10-cv-00785-MO, 2011 WL 3704124, at *7 (D. Or. Aug. 23, 2011); see also Tracer v. Astrue, No. 03:10-cv-6180-HZ, 2011 WL 2710271, at *10 (D. Or. July 12, 2011) (collecting cases).  Therefore, the ALJ's reliance on the VE's testimony that Inman can perform a job with a reasoning level of 2 is supported by substantial evidence.  Since the ALJ identified at least one appropriate job, I need not address whether the jobs with a reasoning level 3 would also satisfy Inman's limitations.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards.  For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this ____11th____ day of April, 2014.

/s/ Garr M. King_____
Garr M. King
United States District Judge

Page 19 - OPINION AND ORDER